IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Maria Lyburtus,                  :

    Plaintiff,              :

  v.                             :         Case No. 2:08-cv-0724

Michael J. Astrue,               :         JUDGE FROST
Commissioner of Social Security,           MAGISTRATE JUDGE KEMP
                                 :
    Defendant.


REPORT AND RECOMMENDATION

I. Introduction

    Plaintiff, Maria Lyburtus, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income. That application, which was protectively filed on April 5, 2005, alleged that plaintiff became disabled on January 1, 1999, as a result of chronic pancreatitis, depression and problems with her legs.

    After initial administrative denials of her claim, plaintiff was afforded a hearing before an Administrative Law Judge (ALJ) on November 5, 2007. In a decision dated December 20, 2007, the ALJ denied benefits. That decision became the final decision of the Commissioner when the Appeals Council denied review on May 22, 2008.

    Plaintiff thereafter timely commenced this civil action. The record of administrative proceedings was filed in this Court on October 10, 2008. Plaintiff filed a Statement of Errors on February 9, 2009, to which the Commissioner responded on March 11, 2009. Plaintiff filed a reply to the Commissioner's Memorandum in Opposition on March 23, 2009, and the matter is now ripe for decision.

## II. The Lay Testimony

Plaintiff's testimony at the administrative hearing revealed the following. Plaintiff, who was 51 years old at the time of the administrative hearing, has a limited 8th grade education. (Tr. 334, 75).

Plaintiff testified that she took cocaine in the past, and drank more than 6 beers per day for many years. (Tr. 321). She testified that she did not drink that much anymore, claiming she drank only "once in a while." (Tr. 322). Plaintiff claimed she obtained alcohol from friends and a neighbor. (Tr. 322-24). Plaintiff admitted that in July 2007, her case worker asked her to go to AA, but she wanted to wait to see how well her medication worked. She testified that her medication was "kind of helping me" and she did not go to AA because she was not drinking as much as before. (Tr. 327).

Plaintiff estimated she could walk for about 15 minutes, about the length of a block. (Tr. 329). When it gets cold, her hands turn purple and they get numb. (Tr. 330). Plaintiff testified she cannot read or write. (Tr. 331).

Plaintiff's case worker at Columbus Area Inc., Jennifer Smith, testified that she had been working with the Plaintiff since June 2007. Plaintiff had cut down on her alcohol consumption in the last month, and she noticed that plaintiff had "more motivation" and was sleeping a bit better. (Tr. 328-29). She believed that plaintiff's depression and anxiety, but not alcohol use, were her main problems. (Tr. 336). Ms. Smith further testified that going to AA "has been discussed" but plaintiff's lack of transportation, coupled with her social anxiety, prevented plaintiff from riding the bus to meetings. (Tr. 335).

## III. The Medical and School Records

Pertinent records reveal the following. School records from

1968, when Plaintiff was in the 5th grade, reflect a performance IQ of 72, verbal IQ of 77 and full scale IQ of 72. (Tr. 77). The following year, tests revealed a performance IQ of 86, verbal IQ of 80 and full scale IQ of 81. (Tr. 79)

In July 2000 and January 2001, plaintiff was admitted to the hospital for acute pancreatitis. She had a history of alcohol abuse and chronic pancreatitis with previous hospitalizations including "many related exacerbations of chronic pancreatitis or alcohol related gastritis." (Tr. 83-113, 117-27).

Dr. Gallagher examined plaintiff on May 31, 2005. At that examination, plaintiff reported a history of alcohol related detoxification and seizures, that she did not like being around others, was unable to read and write, felt she was unable to process things, had difficulty with memory and was depressed. Dr. Gallagher noted that plaintiff appeared depressed, and had difficulty remembering some medical history. Dr. Gallagher believed plaintiff could follow directions, but not perform work that required literacy. She could lift 10 pounds, and should not be placed in positions that required manipulation of fine objects or repeated lifting or carrying. (Tr. 186-93).

Dr. Virgil, a psychologist, examined plaintiff on July 26, 2005. Plaintiff reported she was disabled because she was illiterate. She also reported she suffered from pancreatitis, headaches, problems with her legs, back and carpal tunnel syndrome. She reported a depressed mood, "all my life," with difficulty sleeping and periods of crying. Clinical testing revealed a reading level at the 2.9 grade level. IQ scores revealed a performance IQ of 60, verbal IQ of 61 and full scale IQ of 58, placing her in the mild mental retardation range. Dr. Virgil estimated that she actually functioned at the borderline level, and suspected that intellectual and cognitive functioning were detrimentally impacted by years of alcoholism. Dr. Virgil

concluded plaintiff's daily activities were moderately impaired, and she could not likely sustain adaptive interaction with supervisors or coworkers. She had borderline attention, concentration and immediate memory ability, which would severely impact her ability to follow repetitive tasks requiring close attention and concentration. Dr. Virgil opined that plaintiff would not likely be able to sustain a work regime due to borderline intelligence, impaired memory, depressed mood, and alcohol dependence and marijuana abuse. (Tr. 194-99).

In August 2005, Dr. Lewin, a state agency reviewing psychologist, concluded that plaintiff had moderate limitations in daily activities, social functioning, and with concentration, persistence or pace, but no episodes of decompensation. Dr. Lewin noted that Dr. Virgil's conclusion that plaintiff would have difficulty relating was contradicted by the record which showed that she was on friendly terms with her landlord, who transported her to the exam, and reported no serious problems relating at her last job. Dr. Lewin concluded that plaintiff would work best in a low stress environment, where relating is only superficial, and there is no fast production pace. She could handle basic, one-to-two-step instructions, and perform basic tasks. (Tr. 209-27).

In July 2006, Dr. Tilley performed a consultative psychological examination. Plaintiff reported working in daycare and in a floral shop in the 1990s, with her longest span of employment being one year. Plaintiff further reported that she drank 6 beers a day and required alcohol to stave off withdrawal. She complained of depressed mood and her affect was "overtly dysphoric." She had no expressive or receptive language skill deficiencies. IQ testing resulted in a verbal IQ of 61, performance IQ of 62, and full scale IQ of 58. Dr. Tilley opined that the onset of her retardation "is judged to have occurred

before she was 18 years of age." Dr. Tilley diagnosed plaintiff with Alcohol Dependence with Physiological Dependence, Alcohol-Induced Mood Disorder, With Depressed Features, and Mild Mental Retardation. He assigned plaintiff a GAF of 40 currently, and 43 highest in the past year. Dr. Tilley opined that plaintiff was unemployable. (Tr. 237-44; 251-53). He opined that plaintiff had moderate to marked limitations in 13 out of 20 categories of functioning. (Tr. 248-49).

In May 2007, plaintiff referred herself to Columbus Area Inc., complaining of intense depression, low energy, anxiety, and feeling worthless. She reported having these symptoms most of her adult life and being able to keep them under control. She had a depressed mood and affect. She reported that she last worked in 1994, arranging flowers, and stopped due to physical problems. Plaintiff reported that she "need[ed] linkage to community resources to apply for SSI and Medicaid." Plaintiff was seen for therapy sessions in June 2007. (Tr. 276-91). During a home visit which occurred on June 13, 2007, plaintiff's home was clean and tidy but she reported that she may neglect keeping her house when she was "very depressed." She reported weekly panic attacks. (Tr. 273). On June 25, 2007, plaintiff reported that she was down because she was worried about her son and she reported she had a panic attack that morning. (Tr. 269).

On July 25, 2007, Dr. Garas, plaintiff's treating psychiatrist from Columbus Area, Inc., reported he began treating plaintiff in June 2007, and that plaintiff had been in counseling and case management since May 2007. Dr. Garas assigned plaintiff a current GAF score of 50. Dr. Garas thought that plaintiff had a poor ability to follow work rules, maintain attention and concentration, and perform detailed job instructions. He noted that she had severe depression which caused lack of energy and motivation, and that she had a very limited ability to be in

public due to "extreme panic attacks." (Tr. 259-62).

Dr. Garas saw plaintiff on July 25, 2007, August 14, 2007, and September 19, 2007. (Tr. 298, 301, 304). In September 2007, Dr. Garas reported that after starting Lexapro, Plaintiff was "doing okay" but she was still somewhat depressed. (Tr. 298). However, she continued to drink. Id. Dr. Garas diagnosed a history of depression and alcohol abuse, and indicated plaintiff would follow up in 4 weeks. Id.

### IV.  The Expert Testimony

Dr. Jilhewar, the medical expert, testified that from a physical standpoint, plaintiff had reported low back pain and that one of her fingers had been amputated. She also had varicosities in both legs. He also noted some of the psychological assessments described above, and that the records show some gastritis due to alcohol consumption. The only limitation he appeared to impose was the inability to grasp large objects with her right hand. (Tr. 344-49).

A vocational expert, Ms. Gianforte, also testified at the administrative hearing. The ALJ posed a hypothetical question, describing someone of plaintiff's education and vocational profile who had limited reading and writing skills and was limited to simple, unskilled work with no grasping of large objects with the right non-dominant hand. (Tr. 349). The vocational expert testified that such an individual could perform such jobs as a laundry room attendant, with 1,200 jobs in the Columbus region; school bus monitor, with 1,000 local jobs; and cafeteria attendant, with 4,000 local jobs. (Tr. 350). If the individual was limited to no public contact and no more than superficial contact with supervisors and co-employees, she could perform the job of cleaner, with 10,000 local jobs, and laminating inspector, with 1,000 local jobs. (Tr. 350-51).

### V.  The Administrative Decision

Based on the above evidence, the Commissioner found that plaintiff suffered from a partial amputation of the index finger on her right (non-dominant) hand, social anxiety, and borderline intellectual functioning. As a result of these impairments, plaintiff had no vocationally significant physical limitations, but was unable to grasp large (over 4 centimeters in diameter) objects independently with the right (non-dominant) hand. Plaintiff was limited to simple, unskilled work but she could lift and/or carry up to 100 pounds, as well as sit, stand and/or walk for six hours out of an eight-hour workday. Plaintiff had no past relevant work. Based on the testimony of the vocational expert, the Commissioner found that, based on the vocational testimony, plaintiff could perform a significant number of jobs in the national economy. As a result, she was found not to be disabled.

## VI. Legal Analysis

In her statement of errors, plaintiff raises two main issues. First, she asserts that the Commissioner failed to properly consider all of the evidence, including the functional limitations imposed by Dr. Garas, Dr. Virgil, and Dr. Gallagher. Plaintiff further contends that the Commissioner, while accepting some of the limitations imposed by Dr. Tilley, improperly discounted Dr. Tilley's other conclusions. Further, she argues that the Commissioner erred by failing to mention the sworn testimony of plaintiff's mental health caseworker. She also asserts that the Commissioner erred by failing properly to consider the listed impairments by injecting his own unsupported medical opinion about the validity of plaintiff's I.Q. scores and by failing to evaluate correctly Listings 12.02 and 12.05(c). Finally, she argues that the Commissioner erred by improperly relying on a medical expert for a residual functional capacity rooted primarily in psychological limitations. The underlying

issue is whether the Commissioner's decision is supported by substantial evidence.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Secretary's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Secretary's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Secretary's decision must be affirmed so long as his determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

There is a common theme behind most of plaintiff's assertions - that there was a plethora of evidence in this record, mostly concerning plaintiff's functional limitations arising out of her psychological impairments, and that the ALJ's consideration and discussion of this evidence was wholly inadequate.  Primarily for the reasons set forth in the

plaintiff's statement of errors and the reply brief, the Court agrees that the discussion of the evidence was significantly deficient, and that a remand is required so that a more complete explanation of the Commissioner's actual rationale for making a decision in this case can be provided.  This serves the dual purpose of informing the claimant exactly why his or her application has been denied (if that is the ultimate result) and providing a reviewing Court with a basis for determining if the Commissioner actually followed the governing law and gave proper weight and consideration to factors which legitimately permitted the Commissioner to reach the conclusions under review.

    Here, the key issue in the case is plaintiff's residual functional capacity, primarily from a psychological standpoint (although there is some issue with the way in which the ALJ dealt with her physical impairment as well).  It is black-letter law in every circuit that "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity in step four."  Fargnoli v. Massanari, 247 F.3d 34, 41 (3d. Cir. 2001), citing, inter alia, 20 C.F.R. §§404.1527(e)(2), 404.1545(a), and 404.1546.  As that court also observed, "the ALJ's residual functional capacity must 'be accompanied by a clear and satisfactory explication of the basis on which it rests.'" Id., quoting Cotter v. Harris, 642 F.2d 700,704 (3d. Cir. 1981).  Cotter explained that the reason for requiring a clear explanation of the ALJ's decision is "so ... a reviewing court may know the basis for the decision" and "so that the court may properly exercise its responsibility under 42 U.S.C. §405(g) to determine if the [administrative] decisions is supported by substantial evidence."  Id. at 705.

    Clearly, if an ALJ rejects the opinion of a treating source, the record must not only contain evidence of valid reasons for doing so, but the ALJ must articulate how the decision to reject

that opinion was made. Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007); Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004). In addition, the ALJ is required "to evaluate all medical opinions according to several factors, regardless of their source, unless the opinion is a treating source's opinion entitled to controlling weight." Walton v. Commissioner, 187 F.3d 639 (6th Cir. June 7, 1999) (unreported, text in Westlaw, No. 97-2030). Plaintiff contends that the ALJ in this case violated both of the precepts, and the Court agrees.

Dr. Garas treated plaintiff for her psychological difficulties. He saw her several times before expressing an opinion on her residual functional capacity. The ALJ's decision fails to mention him by name or to discuss in any detail his conclusions. He may well have qualified as a treating source, although the Commissioner's memorandum disputes that. Even if he did not, the ALJ was under some obligation to explain whether or not he considered Dr. Garas to be a treating source, and to explain how his opinion was considered. The ALJ's decision does neither.

There were a number of other examining but non-treating sources who expressed opinions as to plaintiff's residual mental functional capacity as well. One of those opinions is discussed to some extent in the administrative decision (that of Dr. Tilley), but none of the others are even mentioned. It is therefore impossible for the Court to determine if the ALJ actually followed the law which required him to consider those opinions, and also impossible for the Court to determine if he gave any of them appropriate weight (or, conversely, had some reason to discount their opinions) because he articulated no rationale for ignoring them altogether.

There are several other factors which make a remand

appropriate as well.  Although it is not entirely clear how the
ALJ reached his determination as to plaintiff's residual
functional capacity, he states that he relied heavily upon the
opinion of Dr. Jilhewar, the medical expert.  The administrative
decision recites that the expert "concurred with the residual
functional capacity reached in this decision," and the ALJ stated
that "I give considerable weight the opinion of Dr.'s (sic)
opinion." (Tr. 20).  However, it is difficult, if not impossible,
to determine from the testimony of record exactly why the ALJ
believed Dr. Jilhewar agreed with the residual functional
capacity, since he was never asked to express his opinion about
an RFC, and is also not clear whether he concurred with the
psychological limitations imposed by the ALJ nor whether he would
have been qualified to do so.  The ALJ also seemed to believe
that Dr. Gallagher was a chiropractor, when that clearly was not
the case.  He did not follow the mandated procedure for
evaluating a claimant who has substance abuse problems and made
no finding as to whether her substance abuse disorder was
material to her claim of disability.  Finally, his various
comments to plaintiff, her attorney, or her witness during the
administrative hearing appear to the Court to be somewhat
misplaced and susceptible of conveying the wrong impression to
the claimant as to the ALJ's role in the decision-making process.
See, e.g., Tr. 322,324-25, 334, 336-37, 338-40, 343.  The
Commissioner may wish to consider whether remand to a different
ALJ would be a wise course of action.

    For the foregoing reasons, it is recommended that the
plaintiff's statement of errors be sustained and that this case
be remanded to the Commissioner pursuant to 42 U.S.C. §405(g),
sentence four.

### VII. Procedure on Objections

    If any party objects to this Report and Recommendation,

that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge